UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FRANTZ MOLEON, *on his own behalf and on behalf of
similarly situated former and current employees,*

                                              Plaintiffs,

                    -v-

FRED ALSTON *et al.,*

                                              Defendants.

21 Civ. 1398 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This case involves claims by a garage attendant who was terminated for an act of public

urination.  Plaintiff Frantz Moleon ("Moleon") was fired in October 2020 by his employer SP

Plus Corporation ("SP Plus") after he urinated outside an occupied employee bathroom, an act

that Moleon claims occurred because SP Plus had failed to accommodate his diabetes.  Moleon

here brings claims under four federal statutes (the Employee Retirement Income Security Act

("ERISA") §§ 410, 510, 29 U.S.C. §§ 1104, 1140; 42 U.S.C. § 1981; 42 U.S.C. § 1983; and 29

U.S.C. § 201 *et seq.*) and state tort law, arising both from his termination and from the conditions

of his employment.  These claims are brought against three sets of defendants: (1) SP Plus and its

regional human resources director Margarita Lopez ("Lopez") (together, the "Employer

Defendants"); (2) Fred Alston ("Alston") in his capacity as the President of Garage Employees

Local Union 272 (the "Union") and unnamed Union representative John Doe 1 ("Doe")

(together, the "Union Defendants"); and (3) Kent Security Corporation ("Kent Security") and

Kent Security employee Ronald Manning ("Manning") (together, the "Kent Defendants").

The Employer Defendants have moved to dismiss all claims against them in the Second Amended Complaint ("SAC"), and the Union Defendants have moved to dismiss all claims but one. The Kent Defendants have answered and have not moved to dismiss. For the reasons that follow, the Court grants both motions to dismiss in full.

## I.    Background

### A.    Factual Background[1]

#### 1.    The Parties

Moleon, a New Jersey resident, worked as a garage attendant for SP Plus at various locations in New York City for 15 years—between October 27, 2005 and October 8, 2020, when he was discharged. SAC ¶¶ 10, 18. Since December 2005, he had been a member of the Union and participated in its health, welfare, and pension plan. *Id.* His terms of employment were covered by a collective bargaining agreement ("CBA") between the Union and SP Plus. *Id.* ¶ 18. In 2006, Moleon was diagnosed with diabetes, which requires daily administrations of insulin and impairs Moleon's bladder control. *Id.* ¶¶ 26–27. Moleon is Black and, as of the date of his discharge, was age 56. *Id.* ¶¶ 44, 150.

SP Plus is a Delaware corporation that operates parking garages in New York State and City. *Id.* ¶ 12. At all relevant times, Lopez was a regional human resources director for SP Plus. *Id.* ¶ 14.

---

[1] This factual account draws from the SAC. Dkt. 51. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). For the purpose of resolving the motion to dismiss under Rule 12(b)(6), the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

The Union is a local affiliate of the International Brotherhood of Teamsters. Its principal office is in New York City. *Id.* ¶ 13. Doe is an unidentified Union representative who worked at a branch office. As relevant here, Doe, on behalf of the Union, received Moleon's request for a meeting to grieve his discharge. *Id.* ¶¶ 58, 71.

Kent Security is a corporation that provides security services. *Id.* ¶ 15. Manning is a Kent Security employee. Relevant here, he occupied the bathroom that Moleon unsuccessfully sought to enter on October 1, 2020, and he filed the initial incident report accusing Moleon of public urination. *Id.* ¶¶ 16–17.

### 2. March 2020: Moleon's Deteriorating Work Conditions

As of late March 2020, Moleon had worked without interruption for SP Plus since 2005 and was in good standing, save for a single disciplinary "write up" unrelated to the events at issue. *Id.* ¶¶ 10, 18, 26, 32. As of his discharge in October 2020, his pension rights had fully vested and he was eligible to receive pension benefits. *Id.* ¶¶ 10, 77, 98, 121. Under the CBA's seniority clause, he was guaranteed preferred work assignments over more junior employees. *Id.* ¶¶ 36, 133, 150.

Moleon's work conditions, and his relationship with SP Plus and the Union, began to deteriorate in late March 2020, when SP Plus began experiencing business disruptions due to the COVID-19 pandemic. *See id.* ¶ 18. Before the pandemic, Moleon had been assigned steady eight-hour shifts and 40-hour work weeks, usually at a single site. *Id.* ¶¶ 26, 38, 195. Even then, SP Plus had repeatedly denied Moleon and other employees breaks and restricted bathroom access during their shifts. *Id.* ¶¶ 32, 34. But, because Moleon's shifts regularly ran from 3 p.m. to 11 p.m. during the eight years before his discharge, he was able to administer his insulin before work, which reduced his urgency to urinate. *Id.* ¶ 26.

When the pandemic began, SP Plus began to give Moleon erratic shifts, abruptly reduced his workload to 13 hours per week, and assigned him to remote locations and sometimes to as many as six worksites in a day without compensating him for the traveling time between them. *Id.* ¶¶ 38, 39, 42, 77, 150, 159, 195–196. At times, Moleon, who did not own a car, was unable to reach his destinations by public transportation. *Id.* ¶¶ 20, 39–41. At the remote sites, Moleon was "denied water and any breaks." *Id.* ¶ 150; *see also id.* ¶¶ 159, 196. Beginning in April 2020, employees junior to Moleon were given longer shifts and other "high class" work assignments, in violation of the CBA's seniority clause. *Id.* ¶¶ 38, 103, 150, 184. One such unidentified employee, who was assigned eight more work hours per week than Moleon, was not Black. *Id.* ¶¶ 184, 192. In these circumstances, it was impossible for Moleon to administer his insulin, take the bathroom breaks he needed, or properly refrigerate his special dietary meals. *See id.* ¶¶ 26, 49, 70, 91, 159.

SP Plus and the Union allegedly threatened to withhold contributions to Moleon's ERISA plans or to terminate him if he refused those assignments or failed to work 40 hours per week, even though his weekly assignments were for less than 40 hours. *Id.* ¶¶ 42, 77, 98, 150. SP Plus also withheld his hourly wage increase of $0.35 after it had become effective under the CBA on March 2, 2020. *Id.* ¶¶ 23, 102, 150. At times, Moleon was "not timely paid" or was not paid "at all." *Id.* ¶ 37. On March 2, 2020, SP Plus designated Moleon "terminated" although it continued to employ him; this deprived Moleon of his health plan benefits. *Id.* ¶ 150.

The Union, for its part, despite requests from Moleon, refused to grieve SP Plus's failure to provide bathroom breaks, bathroom access, accommodations to administer his insulin, or to pay his wages. *Id.* ¶¶ 23, 48, 73, 83, 93, 120, 141. Union representative Jose Rojas stated to Moleon that the Union did not raise the issue of accommodating his diabetic condition with SP

Plus because, if it did so for Moleon, it would have to do so for too many other employees. *Id.*
¶¶ 83, 120, 141, 155, 201. On an unspecified date, Moleon filed charges against SP Plus with
the National Labor Relations Board ("NLRB") to investigate those conditions. *Id.* ¶ 20. In
August 2020, Moleon complained to SP Plus directly about these conditions, but it ignored his
requests and instead installed a camera to surveil him. *Id.* ¶¶ 27, 150.

### 3. October 1, 2020: The Urination Incident

On October 1, 2020, Moleon was working at a garage at 303 Sands Street in Brooklyn,
New York, on an eight-hour shift during which, despite his requests, he did not receive any
restroom breaks, a lunch break, or an opportunity to administer his insulin. *Id.* ¶¶ 18, 22, 27, 49–
51, 154. The bathroom was available only upon requesting a key. *Id.* ¶¶ 31, 49, 73.

Needing to relieve himself, Moleon went to the employees' single-stall restroom, which
was shared with several other companies, including Kent Security, and occupied at that moment
by Manning. *Id.* ¶¶ 18, 31, 51, 171. Despite Moleon's "desperate[] knock[s]," Manning did not
vacate the restroom. The next bathroom was a 10-minute walk away—too far for Moleon to
reach in time. *Id.* ¶¶ 31, 51.

Moleon ultimately lost control of his bladder and involuntarily relieved himself. *Id.* ¶¶
52, 150, 171, 172, 178. When Manning emerged from the stall and "berate[d]" him, Moleon
explained his diabetic condition to Manning and cleaned up the urine. *Id.* ¶¶ 52, 197. Manning,
however, filed an incident report with Kent Security stating that he had "caught [Moleon]
urinating in public" and "vandali[zing]" the worksite. *Id.* ¶¶ 15–16, 22, 53, 89, 171. On the
report, Manning checked the category "vandalism" instead of "accident." *Id.* ¶¶ 150, 197, 211.
This report was forwarded to SP Plus, Lopez, and the Union. *Id.* ¶¶ 53, 89, 174–175. Manning
further told SP Plus and the Union that Moleon had "intentionally" vandalized the bathroom and
"purposely urinated in public." *Id.* ¶¶ 18, 67, 87, 90. A surveillance video of the incident exists

which would validate Moleon's version of events, but SP Plus has denied Moleon access to it. *Id.* ¶¶ 18, 52. At the time of the incident, the Union, SP Plus, Lopez, Kent Security, and Manning all knew of Moleon's diabetes and difficulty controlling his bladder. *Id.* ¶¶ 22, 48, 55, 68, 74, 150, 159, 177, 200, 211.

### 4.   October 8–27, 2020: Moleon's Termination and Discharge Grievance

On October 8, 2020, SP Plus terminated Moleon. *Id.* ¶¶ 18, 60. Lopez, SP Plus's human resources director, made the termination decision based on Manning's incident report. *Id.* ¶¶ 18, 53. On the phone call informing Moleon of his discharge, Lopez stated that he had "peed in public," engaged in "vandalism," "gross misconduct," and "unprofessional conduct," and could not be "trusted again not to do this in a customer's car." *Id.* ¶¶ 56, 61, 171, 212. The statements were overheard by three unnamed participants on the call and by SP Plus employees within earshot at Lopez's office. *Id.* ¶¶ 60, 113. Those statements also appeared in Moleon's discharge documents, which are in SP Plus's sole possession. *Id.* ¶ 21. Moleon asserts that Lopez's statements were false in that they (1) depicted Moleon's urination as intentional and (2) claimed that the incident occurred in a public place. *Id.* ¶¶ 60–63, 67–68.

On October 16, 2020, Moleon and his wife went to the Union's office to file a discharge grievance and request a hearing. *Id.* ¶ 58. There, Union representative Doe loudly and repeatedly stated that Moleon had "urinated in public," which was "grounds for termination." *Id.* ¶¶ 22, 58, 72, 86, 92, 151, 176. These statements were overheard by other, unidentified Union members. *Id.* ¶¶ 22, 58, 72, 86, 151.

On October 27, 2020, a grievance meeting regarding the discharge occurred. *Id.* ¶¶ 71, 85, 155. There, Lopez and Alston accused Moleon of violating SP Plus policy by urinating outside the bathroom. *Id.* ¶¶ 74, 95. The Union at the meeting adopted the allegedly false

position that Moleon had intentionally urinated outside the employee bathroom. *Id.* ¶¶ 87, 90, 155. The Union thereby "collud[ed]" with SP Plus, failed to vigorously represent him at the hearing, and refused to pursue arbitration thereafter. *Id.* ¶ 54. *See also id.* ¶¶ 70, 84, 91, 94, 213, 216. The SAC alleges that, in adopting a false account of the urination incident, SP Plus, Lopez, and the Union were motivated by racial bias. *Id.* ¶¶ 150, 201. Elsewhere, the SAC alleges that the Union and SP Plus's motives included (1) avoiding paying Moleon his ERISA plan benefits, (2) age bias, (3) disability bias, (4) retaliation for requesting break times and other improvements to his terms and conditions of employment, and (5) retaliation for having filed charges with the NLRB. *Id.* ¶¶ 20, 118, 122, 126, 143.

The incident and its aftermath caused Moleon stress, anxiety, trauma, high blood pressure, hypertension, and loss of spousal consortium. *Id.* ¶¶ 22, 38, 66, 89, 152, 158, 166. The accusations of vandalism and intentional public urination were particularly outrageous, the SAC alleges, because SP Plus created the conditions that caused Moleon to be unable to timely access a restroom, and the Union did not intercede beforehand to address this problem. *Id.* ¶¶ 55, 64, 75–76, 91.

### 5.    Allegations as to Other SP Plus Employees

On "information and belief," at least five other Black SP Plus employees—two of whom are identified in the SAC as "Elie" and "Baurel"— received undesirable work assignments and thereafter were wrongfully discharged. *Id.* ¶¶ 43, 45–47, 78, 116, 119, 132, 204. Like Moleon, each was between ages 57 and 60, had been an ERISA plan participant for 18-20 years, and was fully vested in his or her pension benefit rights. *Id.* ¶¶ 116, 132. Each was discharged because of their race, age, disability, need for bathroom breaks, or for the purpose of preventing paying out their full pension benefits. *Id.* ¶¶ 116, 119, 204.

### B.     Procedural Background

On February 17, 2021, Moleon filed a complaint, Dkt. 1, and, on February 19, 2021, a corrected version, Dkt. 10.  On March 18, 2021, Moleon filed a first amended complaint ("FAC").  Dkt. 24.  On May 21, 2021, the Kent Defendants filed an answer to the FAC and crossclaims against SP Plus, Lopez, the Union, and Doe.  Dkt. 40.  On May 25, 2021, the Union Defendants filed a partial motion to dismiss.  Dkt. 43.

On June 15, 2021, Moleon filed the SAC, the operative complaint today.  Dkt. 51.  He claims interference with ERISA plan benefits, in violation of ERISA § 510, 29 U.S.C. § 1140; a hostile work environment and wrongful discharge, each in violation of 42 U.S.C. § 1981; and deprivation of federal rights under 42 U.S.C. § 1983.  He also brings state-law tort claims: for intentional infliction of emotional distress ("IIED"), defamation *per se*, *prima facie* tort, and civil conspiracy.  He also brings claims against the Union for a breach of duty to fairly represent him under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, and a claim of breach of its ERISA plan fiduciary duties under ERISA § 404, 29 U.S.C. § 1104.

On July 6, 2021, the Union Defendants filed a motion under Federal Rule of Civil Procedure 12(b)(6) to dismiss all claims against them save the claim of a breach of a duty of fair representation.  Dkt. 57 ("Union MTD").  The same day, the Employer Defendants filed a motion under Rule 12(b)(6) to dismiss all claims against them, Dkt. 61 ("Employer MTD"); and the Kent Defendants filed an answer, Dkt. 67 ("Kent Answer").  On August 20, 2021, Moleon filed oppositions to the Union MTD, Dkt. 71 ("Opp. to Union MTD"), and to the Employer MTD, Dkt. 72 ("Opp. to Employer MTD").  On September 1, 2021, the Union Defendants filed a reply, see Dkt 73 ("Union Reply"); and on September 3, 2021, the Employer Defendants filed a reply, *see* Dkt. 74 ("Employer Reply").

8

## II.     Discussion

The Court—after reviewing the governing legal standards—addresses in turn defendants'

challenges to the SAC's claims under ERISA, § 1981, and § 1983, and then addresses the SAC's

state-law claims.

### A.      Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough

facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where,

as a matter of law, "the allegations in a complaint, however true, could not raise a claim of

entitlement to relief." *Twombly*, 550 U.S. at 558.  When resolving a motion to dismiss, the Court

must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the

plaintiff." *Koch*, 699 F.3d at 145.  That tenet, however, does not apply to legal conclusions. *See*

*Iqbal*, 556 U.S. at 678.  Pleadings that offer only "labels and conclusions" or "a formulaic

recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

### B.      Claims Under ERISA

The SAC alleges that the Employer Defendants interfered with Moleon's health, welfare,

and pension benefits in violation of ERISA § 510 by discriminatorily (1) imposing work

conditions—erratic shifts, remote locations, and a lack of bathroom access, breaks, and

accommodations—that  precipitated his loss of bladder control; (2) terminating and threatening

the denial of his ERISA benefits and contributions if he did not accept his work assignments; and

(3) discharging him on the pretext that his urination had been intentional and/or an act of

vandalism. SAC ¶¶ 19, 40, 42, 77, 94, 98, 128, 131, 159.  It alleges that the Employer

Defendants discriminated against Moleon based on his race, age, and disability or medical status. *Id.* ¶ 44. The SAC also alleges that SP Plus retaliated against Moleon in violation of § 510 for having "request[ed] lawful terms and conditions of employment." *Id.*

The SAC alleges that the Union also violated § 510 by discriminatorily refusing his requests to grieve his work conditions and arbitrate his termination, *id.* ¶¶ 19, 20, 77, and by replacing older employees, such as Moleon, with younger ones, so as to save on pension benefits, *id.* ¶¶ 100, 125. The SAC separately alleges that the Union breached its fiduciary duty to him under ERISA § 404, again by (1) failing to grieve his complaints about his work conditions and (2) refusing to pursue arbitration after his discharge grievance failed. *Id.* ¶¶ 34, 69, 104, 109.

Moleon also purports to sue both SP Plus and the Union on behalf of not only himself, but of five other Black SP Plus employees who had allegedly been vested in their ERISA pension benefits and were wrongfully or constructively discharged. *Id.* ¶¶ 43–47, 138.

For the reasons that follow, the Court dismisses all ERISA claims.

### 1. ERISA § 510

#### a. Applicable Legal Standards

Under ERISA § 510, it is "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant [in an employee benefit plan] for exercising any right to which he is entitled under the provisions of [that] employee benefit plan." 29 U.S.C. § 1140. As relevant here, ERISA § 510 recognizes claims of interference with rights under a benefit plan (1) based on discrimination for the plaintiff's membership in a protected group, and (2) in retaliation for exercising an ERISA-protected right.

Both species of claims are analyzed under the familiar framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108,

1112 (2d Cir. 1988) ("[T]he *McDonnell Douglas* presumptions and shifting burdens of production are . . . appropriate in the context of discriminatory discharge cases brought under § 510 of ERISA."); *Patterson v. McCarron*, No. 99 Civ. 11078 (AGS), 2001 WL 1488122, at *3 (S.D.N.Y. Nov. 21, 2001) ("Retaliation claims under § 510 of ERISA are analyzed using the burden-shifting framework established in *McDonnell Douglas*."); *O'Reilly v. Consol. Edison Co. of New York*, 173 F. App'x 20, 22 (2d Cir. 2006) (summary order). The plaintiff bears the initial burden of establishing a *prima facie* case of discrimination or retaliation. *Tavoloni v. Mount Sinai Med. Ctr.*, 26 F. Supp. 2d 678, 680 (S.D.N.Y. 1998), *aff'd*, 198 F.3d 235 (2d Cir. 1999). For a claim sounding in discrimination, a plaintiff must show that (1) "he is a member of a protected group"; (2) "he was qualified for the position or other benefit claimed"; and (3) "he was discharged or treated adversely in circumstances that give rise to an inference of discrimination." *Id.* For a claim sounding in retaliation, a plaintiff must show that (1) "he engaged in a protected activity"; (2) the employer "was aware of" plaintiff's protected activity; (3) the employer made "an adverse employment decision" against plaintiff; and (4) there was "a causal connection between the [plaintiff's] protected activity and the adverse employment action." *Giordano v. Thomson*, 564 F.3d 163, 169 (2d Cir. 2009) (citing *Manoharan v. Colum. Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)). *See also Patterson*, 2001 WL 1488122, at *3.

Under either path, "[a]n essential element . . . is to show that an employer was at least in part motivated by the specific intent to engage in activity prohibited by § 510." *Cante v. Baker*, No. 07 Civ. 1716 (ERK), 2009 WL 10706264, at *5 (E.D.N.Y. May 1, 2009) (quoting *Dister*, 859 F.2d at 1111). Protected activity, as used in connection with either type of claim, covers availing oneself of the rights and benefits afforded by an ERISA plan, and testifying in any

ERISA-related inquiries or proceedings. 29 U.S.C. § 1140. And under either analysis, an ERISA § 510 claim does not lie where the loss of benefits was "a mere consequence . . . of an adverse employment action." *Ulrich v. Soft Drink, Brewery Workers & Delivery Emps.*, No. 17 Civ. 4730 (KMK), 2019 WL 1228056, at *30 (S.D.N.Y. Mar. 15, 2019) (quoting *Dister*, 859 F.2d at 1111).

> b.    *Application to the Employer Defendants*

The Employer Defendants argue that the SAC does not plead facts giving rise to a plausible inference of discriminatory or retaliatory intent. Employer MTD at 12–14. They are correct.

The SAC adequately pleads that Moleon received less than his full benefits, and that his substandard work conditions brought about the unfortunate incident in which he had no restroom in which to urinate, leading to his termination. The SAC also pleads sufficient facts that he was threatened that, if he did not accept his work assignments, he would lose ERISA benefits. SAC ¶¶ 42, 77, 98, 150. It also vaguely alleges that "another non-black employee with less seniority" was kept employed while Moleon was discharged. *Id.* ¶ 184. But none of these allegations plausibly gives rise to the inference that SP Plus or Lopez specifically intended—even in part— to interfere with Moleon's ERISA benefits *because* he was Black, old, or diabetic. *Tavoloni*, 26 F. Supp. 2d at 680. Instead, as pled, Moleon's loss of benefits, fair or unfair, was "a mere consequence . . . of an adverse employment action," *Ulrich*, 2019 WL 1228056, at *30. The SAC thus fails to plead a causal link between that adverse action and his membership in a protected group.

Nor does the SAC plausibly plead that SP Plus or Lopez retaliated against him for engaging in ERISA-protected activity. The SAC develops that defendants are responsible for the

regrettable conditions that compelled Moleon to urinate outside the bathroom, SAC ¶¶ 55, 64, 75–76; that they knew the incident was a product of Moleon's diabetes yet falsely accused him of intentional urination and vandalism, *id.* ¶¶ 68, 74, 150, 159; and that his termination was pretextual, *id.* ¶¶ 19, 70, 94, 135. But however harsh or wrongheaded those acts are pled to be, it does not plausibly follow from these factual allegations that the Employer Defendants' true motive in terminating Moleon was to retaliate against him for some unspecified form of ERISA-protected activity, so as to plead a *prima facie* case of retaliation. The SAC pleads none.

        *c.*      *Application to the Union*

Moleon's § 510 claim against the Union fails for similar reasons. The SAC lacks non-conclusory allegations plausibly supporting the inference that the Union intended to interfere with his ERISA benefits because he was Black, old, or diabetic. It faults the Union for failing to grieve his substandard work conditions and refusing to pursue arbitration after his discharge grievance proved unsuccessful. *Id.* ¶¶ 20, 103, 136. Those allegations are the basis for Moleon's claim against the Union for violating its duty of fair representation, which the Union does not move to dismiss. But the SAC's factual claim that the Union "collud[ed]" with SP Plus in terminating Moleon on the pretext that his urination was intentional is conclusory. And even if that fact were well-pled, the § 510 claim would still fail, as it does not plausibly follow that *because* Moleon's termination was founded on a false claim as to the intentionality of his public urination, the true motive for it was to interfere with Moleon's ERISA benefits.

The SAC's retaliation claim against the Union appears to be that the Union colluded with SP Plus to support the false narrative of intentional public urination to enable Moleon to be replaced with younger employees who were ineligible for pension benefits. *Id.* ¶¶ 94, 100, 125.

That allegation, however, is entirely conclusory. The SAC does not plead any facts plausibly indicating the Union's specific intent to thus interfere with Moleon's ERISA rights.

### 2.     ERISA § 404

#### a.     *Applicable Legal Standards*

ERISA § 404(a)(1) requires that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). At the threshold, a court must determine whether a defendant "was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000); *In re DeRogatis*, 904 F.3d 174, 191 (2d Cir. 2018). The statute defines "fiduciary" as follows:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). *See also Doe 1 v. Express Scripts, Inc.*, 837 F. App'x 44, 47–48 (2d Cir. 2020).

In determining which entities are ERISA fiduciaries, courts in this Circuit "focus[] on the function performed, rather than on the title held." *Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir. 1987); *Express Scripts*, 837 F. App'x at 48. Thus, "a person may be an ERISA fiduciary with respect to certain matters but not others; fiduciary status exists only to the extent that the person has or exercises the described authority or responsibility over a plan." *Coulter v. Morgan Stanley & Co.*, 753 F.3d 361, 366 (2d Cir. 2014) (internal quotation marks omitted). A labor union is not a fiduciary simply by virtue of "collect[ing] dues that help fund [a] [p]lan."

*Chauvet v. Local 1199*, Nos. 96 Civ. 2934 (SS), 96 Civ. 4622 (SS), 1996 WL 665610, at *15 (S.D.N.Y. Nov. 18, 1996).

> b.    *Application to the Union*

The SAC's § 404 claim is made solely against the Union.  But measured against these standards, the claim fails.  The SAC does not plead any facts indicating that the Union "exercise[d] any discretionary authority" over, "control[led]," "render[ed] investment advice" on, or "ha[d] any discretionary authority or responsibility in the administration" of Moleon's ERISA plans.  29 U.S.C. § 1002(21)(A).  Its bare statement that the Union "is an ERISA fiduciary for the bargaining unit members' health and welfare plan(s)" does not, as required, plead which functions the alleged fiduciary performed at the time of the challenged action.  SAC ¶ 13.  The Court accordingly dismisses the SAC's claim that the Union breached its fiduciary duties in violation of ERISA § 404.[2]

## C.    Section 1981

The SAC next brings claims under 42 U.S.C. § 1981 of a hostile work environment and of wrongful termination against SP Plus and the Union.  The hostile work environment claim against SP Plus is based on its alleged failing to assign Moleon "high class" work consistent with his seniority, reducing his work hours, threatening to reduce his benefits, and denying him breaks and bathroom access.  *Id.* ¶¶ 38, 40, 42, 98, 150, 159, 195–196.  The wrongful termination claim against SP Plus is based on its allegation that Lopez falsely accused him of vandalism and criminal conduct when in fact he involuntarily had lost bladder control, and that it terminated him on that basis.  *Id.* ¶¶ 119, 122, 150, 202, 203, 206.  The hostile work environment claim against the Union rests on its refusal to grieve his work conditions.  *Id.* ¶¶ 34, 136.  The wrongful

---

[2] Because the Court dismisses all ERISA claims, it dismisses too the derivative ERISA claims Moleon seeks to bring on behalf of similarly situated collective plaintiffs.

termination claim against the Union is based on his pretextual termination. *Id.* ¶¶ 19, 70, 94, 135. Each of these violations, the SAC alleges, was motivated by racial discrimination.

### 1.   Applicable Legal Standards

Claims of racial discrimination under § 1981 are also analyzed using the *McDonnell Douglas* framework. *See Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987). The plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *See Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). To do so, he must show that "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown*, 673 F.3d at 150 (quoting *Holcomb*, 521 F.3d at 138). The burden of establishing a *prima facie* case in an employment discrimination case is "minimal." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019). And at the motion to dismiss stage, a plaintiff "is not required to plead a *prima facie* case under *McDonnell Douglas*." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015); *see also Forkin v. Loc. 804 Union (IBT)*, 394 F. Supp. 3d 287, 307 (E.D.N.Y. 2019) ("At the pleading stage, . . . a plaintiff need not prove discrimination or even allege facts establishing every element of the *McDonnell Douglas prima facie* case."). However, under § 1981, a plaintiff must plausibly allege that "but for race, [she] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1015 (2020). "[I]t is insufficient to merely plead that race was a motivating factor in the discriminatory action." *Brown*, 2021 WL 1163797, at *4–5.

### 2.   Application to the Employer Defendants

The SAC repeatedly incants that, "but for," or "due to" Moleon's race, SP Plus would not have assigned him less desirable work, replaced him with a non-Black worker with less seniority, cast him as a criminal for urinating in public, or terminated or threatened to terminate him.  SAC ¶¶ 78, 150, 202–203, 206.  The Employer Defendants argue that these conclusory allegations do not meet Moleon's burden of pleading but-for causation—and the facts pled do not give rise to an inference of discriminatory intent.  Employer MTD at 13–15.  That is correct.

The SAC's many general allegations along these lines are conclusory.  None pleads, with any specificity, the allegation that, had Moleon not been black, he would not have suffered such adverse actions.  *Comcast*, 140 S. Ct. at 1014.  At one point, the SAC pleads that his urination in front of the bathroom was falsely cast as a criminal act because black men in society are routinely subject to false criminal accusations.  SAC ¶ 150.  But that allegation about society at large is insufficient to plausibly plead a race-discriminatory motivation here.  It is the type of "formulaic recitation[s]" and conclusory allegation that, under *Twombly*, "will not do." *See* 550 U.S. at 555.  As to Lopez, the SAC does not allege, even conclusorily, that any action she took was on the basis of Moleon's race.  The Court thus dismisses Moleon's § 1981 claims against SP Plus and Lopez.

### 3.   Application to the Union Defendants

The SAC's allegations as to the Union are of a similar character.  It alleges that, "[b]ut for . . . [his] race," the Union would have fully grieved and arbitrated Moleon's claims of decreased work hours and violation of his seniority provision "without hostility or racism toward him."  SAC ¶ 207.  The Union Defendants counter that Moleon's allegations of discriminatory intent are conclusory.  Union MTD at 29–30.  That critique, too, is correct.  The SAC does not

allege any facts that support the specific allegation of racially discriminatory animus by the Union, or that such was the but-for cause of any Union actions relating to Moleon.  It makes broad allegations of the Union's hostility, personal animosity, malice, bad faith, or generalized bias towards Moleon, but no facts are alleged in support of these conclusions.  *See* SAC ¶¶ 9, 24, 55, 73, 83, 91–94, 134, 154, 213.  On the contrary, the SAC pleads alternative (non-race-based) reasons for various actions, including that the Union failed to arbitrate Moleon's discharge because it sought to save on costs and fees, and because the Union was put off by the allegation of public urination.  *Id.* ¶¶ 20, 57, 99–100.

As to Union representative Doe, the SAC pleads that Doe joined in the allegation that Moleon had "urinated in public" in violation of the criminal law and that his "outrageous" claim bespoke racial bias.  *Id.* ¶ 153.  That allegation, too, is conclusory.

The Court thus dismisses Moleon's § 1981 claim against both Union Defendants.[3]

**D.      Section 1983**

The SAC next claims that the Employer Defendants and the Union deprived him of unspecified federal rights under 42 U.S.C. § 1983.

**1.      Applicable Legal Standards**

Section 1983 provides redress for the deprivation of federally protected rights by persons acting under color of state law.  42 U.S.C. § 1983.  To prevail on a § 1983 claim, a plaintiff must establish (1) the violation of a right, privilege, or immunity secured by the Constitution or laws of the United States (2) by a person acting under the color of state law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978).  It is "'[a]n essential

---

[3] Because the Court dismisses the SAC's § 1981 claims on behalf of Moleon, its derivative § 1981 claims on behalf of similarly situated others also must be dismissed.

element of a § 1983 claim . . . that the defendant act under color of state law.' Section 1983 thus generally applies to public officers, not private citizens." *Kurtz v. Hansell*, No. 20 Civ. 3401 (PAE), 2021 WL 1143619, at *9 (S.D.N.Y. Mar. 24, 2021) (quoting *Mortimer v. City of New York*, No. 15 Civ. 7186 (KPF), 2018 WL 1605982, at *12 (S.D.N.Y. Mar. 29, 2018)).

Still, "a private actor acts under color of state law when the private actor 'is a willful participant in joint activity with the state or its agents.'" *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)). "For purposes of § 1983, the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state ('the compulsion test'); (2) when the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity 'has been delegated a public function by the [s]tate' ('the public function test')." *Kurtz*, 2021 WL 1143619, at *9 (quoting *Ciambriello*, 292 F.3d at 324).

### 2.    Application to All Defendants

The Court need not tarry on whether any moving defendant—all private actors—qualifies as a willful-participant in joint activity with the state. That is because Moleon has admitted in his opposition motions that none do. Moleon notes that based on Kent Security's Answer to the SAC, it was a private actor, Opp. to Union MTD at 7, 15, 27; Opp. to Employer MTD at 7, 15, 26, and insofar as the same as true of the Union, Doe, SP Plus, and Lopez, there is no state-actor participant in the events at issue. Because Moleon has explicitly abandoned his § 1983 claims against all defendants, including Kent Security and Manning, the Court dismisses Moleon's § 1983 claims as to all defendants.

### E.   Exercise of Supplemental Jurisdiction Over State Law Claims

Before reaching Moleon's state tort claims, the Court must determine whether it can, and should, exercise supplemental jurisdiction over these claims. "Federal courts have supplemental jurisdiction over state-law claims 'that are so related to claims in the action within [the courts'] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *Martin v. Sprint United Mgmt. Co.*, No. 15 Civ. 5237 (PAE), 2017 WL 5028621, at *2 (S.D.N.Y. Oct. 31, 2017) (citing 28 U.S.C. § 1367(a)); *see also Montefiore Med. Ctr. v. Teamsters Loc. 272*, 642 F.3d 321, 332 (2d Cir. 2011). "Furthermore, the federal claim and state claim must stem from the same 'common nucleus of operative fact,' such that the plaintiff 'would ordinarily be expected to try them all in one judicial proceeding.'" *Montefiore*, 642 F.3d at 332 (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)). Since the exercise of supplemental jurisdiction is discretionary, "a district court should balance the traditional 'values of judicial economy, convenience, fairness, and comity." *Mangum v. City of New York*, 15 Civ. 8810 (PAE), 2016 WL 4619104, at *9 (S.D.N.Y. Sept. 2, 2016) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). And "federal courts have often permitted a plaintiff presenting a federal; claim against one defendant to assert a related state claim against a different defendant." *Baylis v. Marriott Corp.*, 843 F.2d 658, 664 (2d Cir. 1988) (citations omitted).

Here, several federal claims survive, as they were not challenged by the motions to dismiss. These are (1) the claim that the Union breached its duty of fair representation in violation of 29 U.S.C. § 201 *et seq.*; and (2) the § 1981 claims against Kent Security and Manning. The Court thus still has "before it . . . claim[s] sufficient to confer subject matter jurisdiction." *Montefiore*, 642 F.3d at 332 (citing *Gibbs*, 383 U.S. at 725). And these claims

share a common nucleus of fact with Moleon's state tort claims—for IIED, defamation, *prima facie* tort, and civil conspiracy. As pled, the Union's breach of its duty to fairly represent Moleon arises from its refusal to grieve his substandard work conditions and undesirable work assignments and its failure to pursue arbitration after his unsuccessful discharge grievance. Moleon's IIED claims arise, in major part, out of the conduct by SP Plus and Lopez that the Union failed to grieve. Moleon's defamation claims similarly turn on all defendants' allegedly false statements made before, during, and after Moleon's discharge grievance meeting, in which intentional urination and criminal conduct was imputed to him. The remaining federal and state law claims in this action originate from a common nucleus of fact.

In these circumstances, the values of judicial economy, convenience to the parties, and fairness counsel in favor of exercising supplemental jurisdiction. Further, a related case in which Moleon brings additional claims against SP Plus has recently been removed from state court and assigned to this Court. *See Moleon v. SP Plus Corp.*, No. 21 Civ. 8813 (PAE), Dkt. 6. That case brings claims under the Americans With Disabilities Act and similar state laws, and it challenges the same conduct that is at issue here. *Id.* Dkt. 1–2. SP Plus has answered rather than move to dismiss those claims, and an initial conference in 21 Civ. 8813 on November 30, 2021 put in place a unitary discovery schedule governing both cases. *See id.* Dkt. 11. The exercise of supplemental jurisdiction over Moleon's state claims here would therefore consolidate in a single court all claims arising from this controversy, whereas declining to do so would result in litigation between Moleon and SP Plus in multiple forums. These considerations outweigh the interest in comity that might otherwise have counseled deferral. The Court will thus exercise supplemental jurisdiction over Moleon's state law claims.

### F.     State Tort Law Claims Against the Union

#### 1.     Applicable Legal Standards: The *Martin* Rule

"To establish a viable [New York] state law tort claim against a labor organization in

New York State, a plaintiff must plead and establish that each and every member of the union is

individually responsible for the action of which he complains, either by direct participation,

specific authorization, or knowing ratification." *Goodman v. Port Auth. of N.Y & N.J.*, No. 10

Civ. 8352 (RWS), 2011 WL 3423800, at *10 (S.D.N.Y. Aug. 4, 2011) (citing *Martin v. Curran*,

101 N.E.2d 683 (N.Y. 1951)).  "While often criticized, the *Martin* rule has been consistently

followed and remains good law." *A. Terzi Prods., Inc. v. Theatrical Protective Union*, 2 F. Supp.

2d 485, 491 (S.D.N.Y. 1998) (dismissing state tort claims against union and collecting cases).

Although *Martin*'s application to statutory claims has been called into question, the rule

continues to squarely apply to common-law tort claims.  *Langford v. Int'l Union of Operating

Eng'rs*, 765 F. Supp. 2d 486, 509–11 (S.D.N.Y. 2011) ("The decision in *Martin*, therefore, is

heavily tied in with common-law principles.").  *See also Jung Sun Laundry Grp. v. Laundry, Dry

Cleaning & Allied Workers Joint Bd.*, No. 10 Civ. 468 (RMB) (JLC), 2010 WL 4457135, at *4–5

(S.D.N.Y. Nov. 1, 2010) ("[l]iability for tort suits against a union is limited to cases in which the

liability of every single member of association can be alleged"; court dismissed defamation

claim against union based on *Martin* rule (citation and quotation marks omitted)); *R.M. Perlman

Inc. v. N.Y. Coat, Suit, Dresses, & Rainwear & Allied Workers' Union*, 789 F. Supp. 127, 130–

34 (S.D.N.Y. 1992) (dismissing defamation and *prima facie* tort claims against union based on

*Martin* rule); *Sales v. N.Y. City Transit Auth.*, No. 08 Civ. 3420 (LAP), 2010 WL 87758, at *6

(S.D.N.Y. Jan. 7, 2010) (dismissing IIED claim against union for failure to meet *Martin*'s

pleading requirements); *Purnell v. Diesso*, No. 94 Civ. 4361 (RPP), 1996 WL 37770, at *3 n.2

(S.D.N.Y. Jan. 31, 1996) (same); *Mason Tenders Dist. Council v. WTC Contracting, Inc.*, No. 06 Civ. 14200 (JGK), 2007 WL 2119897, at *2 (S.D.N.Y. July 23, 2007) (dismissing state law claims and emphasizing "*Martin*'s continuing vitality.").

### 2.    Application to the Union

The SAC does not plead any facts indicating that all members of Local 272 participated in, authorized, or ratified the Union conduct on which its state tort claims are based.  Indeed, except for Alston, Doe, Alex Gonzalez, and Jose Rojas, the SAC does not mention any union members who could have conceivably sanctioned such conduct. *See* SAC ¶¶ 71–72, 83, 85–86, 120, 141, 155, 201.  For that reason alone, Moleon's common law tort claims as to the Union— IIED, defamation, *prima facie* tort, and civil conspiracy—all fail.[4]

Moleon counters that the New York Court of Appeals has narrowed *Martin* so as not to apply suits brought by union members, such as himself.  Opp. to Union MTD at 21 (citing *R.M. Perlman*, 789 F. Supp. at 131–32 (citing *Madden v. Atkins*, 151 N.E.2d 73 (N.Y. 1958)).  But *Madden*'s exception to *Martin* is not so broad.  It merely applies where a union member brings a civil damages action against his union for wrongfully expelling him. *R.M. Perlman*, 789 F. Supp. at 132 (citing *Morrissey v. Nat'l Mar. Union*, 544 F.2d 19, 33 (2d Cir.1976)).  That is not the case here.

---

[4] The Court thus need not reach the Union Defendants' arguments that the SAC's IIED claim against the Union is preempted by Labor Management Relations Act ("LMRA") § 301, 29 U.S.C. § 185, and is subsumed into the duty of fair representation claim; and that the defamation claim is preempted both by LMRA § 301 and the National Labor Relations Act ("NLRA"). *See* Union MTD at 20–21, 24–27.  That said, even if the *Martin* rule did not apply and regardless of whether any preemption doctrine bars Moleon's state tort claims against the Union, those claims would still require dismissal for reasons substantially tracking those requiring their dismissal as to Doe, SP Plus, and Lopez.

### G.     State Tort Claims Against the Employer Defendants and Doe[5]

#### 1.     Intentional Infliction of Emotional Distress

The SAC's IIED claim centers on conduct in October 2020, SAC ¶ 6, although in his

brief opposing dismissal, Moleon attempts to expand the reach of this claim.  *See* Opp. to

Employer MTD at 22.  The Court generously construes this claim as follows.  SP Plus and Lopez

intentionally inflicted extreme emotional distress on Moleon when Lopez falsely told third

parties that he had (1) urinated in public, (2) engaged in vandalism, gross misconduct, and

unprofessional conduct, and (3) possibly might urinate in a customer's car in the future.  These

defendants also inflicted extreme emotional distress on him by (4) terminating him on the false

pretext of intentional public urination, and because of his race, age, or disability status, (5)

assigning him less desirable work and lower workloads in violation of his seniority rights under

the CBA, (6) threatening him with layoff or discipline if he did not accept those assignments, (7)

withholding wage payments, and (8) denying him bathroom and lunch breaks at his work sites.

*Id.* at 22–24.

As to Doe, the SAC alleges that he "loudly announc[ed]" in a union office lobby that

Moleon "urinated in public . . . [and] that's grounds for termination," for Moleon's wife and

several other union members to hear.  SAC ¶¶ 19, 58, 92, 151.  Despite Moleon's wife's requests

that he cease making those statements, Doe continued to do so, at that meeting and/or later.  *Id.* ¶

---

[5] The Union Defendants argue that the IIED claim against Doe, too, is preempted by LMRA §
301 and is subsumed into Moleon's claim that the Union breached its duty to fairly represent
him. Union MTD at 20–21.  They also argue that the defamation claim against Doe is preempted
by LMRA § 301 and the NLRA.  *Id.* at 24–25.  The Court has disposed of those claims for
failure to state a claim, without occasion to address these preemption arguments.

59. Doe allegedly made repeated statements along those lines to falsely cast Moleon as a criminal who engaged in "vandalism." *Id.* ¶ 153.

   *a.*  *Applicable Legal Standards*

   To plead an IIED claim under New York law, a plaintiff must allege "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Conboy v. AT & T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001) (quoting *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999)); *accord Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993). These requirements, especially that of extreme and outrageous conduct, "are rigorous and difficult to satisfy." *Howell*, 612 N.E.2d at 702; *see also Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 90 (N.Y. 1983) (describing IIED as a "strict standard"). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Chanko v. Am. Broad. Cos.*, 49 N.E.3d 1171, 1179 (N.Y. 2016) (quoting *Howell*, 612 N.E.2d at 702). Thus, "[a]cts which merely constitute harassment, disrespectful or disparate treatment, a hostile environment, humiliating criticism, intimidation, insults or other indignities fail to sustain a claim of infliction of emotional distress because the conduct alleged is not sufficiently outrageous." *Padilla v. Sacks and Sacks, LLP*, No. 19 Civ. 10021 (GBD), 2020 WL 5370799, at *2 (S.D.N.Y. Sept. 8, 2020) (citation omitted).

   Conduct may be "extreme and outrageous" where "there is a deliberate and malicious campaign of harassment or intimidation." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 122–23 (2d Cir. 2019) (quoting *Scollar v. City of New York*, 74 N.Y.S.3d 173, 178 (N.Y. App. Div.

2018)).  The proper inquiry is not merely whether an individual act might be outrageous, but whether the action in totality amounted to a deliberate and malicious campaign.  *Id.* at 123. Where a defendant knows of a plaintiff's susceptibility to emotional distress, non-actionable acts may be transformed into outrageous conduct.  The Restatement (Second) of Torts § 46, to which New York adheres, *see Howell*, 612 N.E.2d 699, thus states that "[t]he extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress."  Otherwise non-actionable conduct "may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge."  *Rich*, 939 F.3d at 123 (quoting Restatement (Second) of Torts § 46 (comment *f*) (1965)).

### b.    *Application to the Employer Defendants*

The Employer Defendants argue that the SAC does not plead facts to plausibly allege the outrageous conduct required of an IIED claim.  Employer MTD at 20–21.  They are correct.

Central to the SAC's IIED claim are Lopez's statements as to Moleon's urination, vandalism and misconduct, and the possibility that he might urinate again in a customer's car. *See* SAC ¶¶ 56, 61, 171, 212.  But these constitute, at most, "disrespectful . . . treatment, a hostile environment, humiliating criticism, . . . insults or other indignities."  *Padilla*, 2020 WL 5370799, at *2.  Such remarks do not meet the "rigorous" IIED standard of conduct going "beyond all possible bounds of decency."  *Howell*, 612 N.E.2d at 702; *Chanko*, 49 N.E.3d at 1179. Similarly, terminating Moleon's employment, even if based on a dubious or incorrect characterization of his state of mind at the time he lost control of his bladder, also falls short of outrageousness.  And assigning him less desirable work in alleged violation of the CBA's seniority clause, whether otherwise actionable, does not come close to the outrageousness threshold.

On the contrary, "New York [c]ourts are reluctant to allow [IIED] claims in employment discrimination cases" and "wary of allowing plaintiffs to recharacterize claims for wrongful or abusive discharge . . . as claims for intentional infliction of emotional distress." *Stevens v. New York*, 691 F. Supp. 2d 392, 399 (S.D.N.Y. 2009) (collecting cases). Threats of termination for refusing to take on undesirable work assignments and deliberate withholding of wage payments also fail to satisfy the outrageousness bar. Such conduct may amount to "harassment," "hostile work environment," and "intimidation," but not, without more, IIED. *See Padilla*, 2020 WL 5370799, at *2. Here, although the SAC fairly accuses SP Plus and Lopez of callousness and insensitivity to human foibles, it does not plead facts to establish a "deliberate and malicious campaign of harassment or intimidation." *Rich*, 939 F.3d at 123.

Finally, the Employer Defendants' alleged refusal to grant Moleon, a known diabetic, "any" bathroom breaks during his shifts, SAC ¶¶ 39, 150, 196, is short of sufficiently outrageous—and in any event, that claim overstates the facts pled. In fact, the SAC pleads that bathroom access was limited: one bathroom was shared with employees of several companies, it was accessible only with a key, and the next bathroom was a 10-minute walk away—but it does not allege that he was barred from using the bathroom. *Id.* ¶¶ 31, 49, 51, 73. Indeed, the SAC implicitly concedes that, although he had not taken "excessive" bathroom breaks the day of the incident, he had taken at least one, *id.* ¶ 27, and the bathroom was available upon requesting a key, *id.* ¶¶ 31, 49, 73. Restricted bathroom access, although challenging and potentially undignified, does not "go beyond all possible bounds of decency." *Howell*, 612 N.E.2d at 702. The Court accordingly dismisses the IIED claim against the Employer Defendants.

The cases on which Moleon relies are easily distinguished. In *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140 (2d Cir. 2014), the employee was subjected to a constant

barrage of racist slurs, anonymous death threats, and spray-painted initials of "KK" (King Kong), "King Kong," and "KKK" near his work station, social isolation, vandalization of his car, and a toy monkey with a noose around its neck hanging from the car. *Id.* at 148–49.  No comparable facts are pled here.  In *Stampf v. Long Island R.R. Co.*, 761 F.3d 192 (2d Cir. 2014), the Second Circuit modified a damages award for past mental and emotional distress, *id.* at 206, but the underlying cause of action was malicious prosecution, not IIED.  The IIED claim had been dismissed as not implicating sufficiently outrageous conduct.  *See* Employer Reply at 9 n.3 (citing *Stampf v. Long Island R.R. Auth.*, No. 07 Civ. 3349 (SMG), 2010 WL 2517700, at *11 (E.D.N.Y. June 14, 2010)).

c.    *Application to Doe*

The SAC does not plausibly plead outrageous conduct either as to Doe, whose conduct as pled, if unbecoming, was far short of "atrocious and utterly intolerable in a civilized community."  *Chanko*, 49 N.E.3d at 1179.  Using hyperbole to describe an event that Moleon concedes happened (his urinating outside a bathroom), casting aspersions on Moleon for doing so, and making such statements in front of others may be "disrespectful [and] humiliating criticism."  *Padilla*, 2020 WL 5370799, at *2.  But it does not plead IIED under the standards set by the case law.  The Court therefore grants the motion to dismiss Moleon's IIED claim against Doe.

**2.    Defamation**

The SAC alleges that four sets of statements by Lopez during and after the discharge grievance hearing were defamatory: that Moleon (1) had "peed in public," urinated in public, or was caught urinating in public; (2) had engaged in "unprofessional" behavior or conduct, and "gross misconduct"; (3) could "not be trusted to do this again in a customer's car"; and (4) had "vandali[zed]" the employee bathroom.  The SAC alleges that Lopez made those statements (1)

28

"in communications to all parties" during the discharge process, (2) to unspecified third parties present on the phone call in which Lopez terminated Moleon, (3) in front of other unspecified SP Plus employees at her office during that call, (4) at Moleon's discharge grievance meeting, and (5) in Moleon's discharge documents. SAC ¶¶ 14, 56, 60, 74, 113, 177. Apparently pursuing a vicarious liability theory, the SAC brings the same claims against Lopez's employer SP Plus.

As to Doe, the SAC alleges defamation based on his repeated public exclamation at the Union office that Moleon had "urinated in public" and that this constituted "grounds for termination." *Id.* ¶¶ 19, 58–59, 72, 86, 92, 151.

### a.   *Applicable Legal Standards*

Defamation is the "making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." *Foster v. Churchill*, 665 N.E.2d 153, 157 (N.Y. 1996) (citations and quotations omitted). Under New York law, to state a claim for defamation, a plaintiff must allege "(1) a written [or spoken] defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019).

At the motion to dismiss stage, the court "must decide whether the statements, considered in the context of the entire publication, are reasonably susceptible of a defamatory connotation, such that the issue is worthy of submission to a jury." *Id.* (citations and quotations omitted); *see also Levin v. McPhee*, 917 F. Supp. 230, 236 (S.D.N.Y. 1996), *aff'd*, 119 F.3d 189 (2d Cir. 1997) (in defamation cases, court's "limited function" is to determine "as a matter of law whether the statements complained of are reasonably susceptible of a defamatory construction"). That

determination is "guided not only by the meaning of the words as they would be commonly understood . . . but by the words considered in the context of their publication." *Levin*, 119 F.3d at 195 (citing *Armstrong v. Simon & Schuster, Inc.*, 649 N.E.2d 825, 829 (N.Y. 1995)). Allegedly defamatory statements must not "be read in isolation, but must be perused as the average reader would against the 'whole apparent scope and intent' of the writing." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (quoting *November v. Time Inc.*, 194 N.E.2d 126, 128 (N.Y. 1963)). A court may not "strain" to interpret statements in their most mild or defamatory sense. *See Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 518 (S.D.N.Y. 2013). Where the challenged statements are "susceptible of multiple meanings, some of which are not defamatory," the court may not conclude, as a matter of law, that the statements are or are not defamatory. *Celle*, 209 F.3d at 178 (citing *Davis v. Ross*, 754 F.2d 80, 83 (2d Cir. 1985)).

As to the element of publication, "a pleading is only sufficient if it adequately identifies the purported communication, and [indicates] who made the statement, when it was made, and to whom it was communicated." *Camp Summit of Summitville, Inc. v. Visinski*, No. 06 Civ. 4994 (CM) (GAY), 2007 WL 1152894, at *10 (S.D.N.Y. Apr. 16, 2007). Where a "[p]laintiff fails to identify to whom these statements were made, or the time and manner in which they were made," a defamation claim does not survive a motion to dismiss. *Ello v. Singh*, 531 F. Supp. 2d 552, 581 (S.D.N.Y. 2007).

As to the element of falsity, "federal courts have required plaintiffs to plead facts that, if proven, would allow a reasonable person to consider the statement false." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017) (collecting cases). Dismissal is appropriate where "the material in the complaint cannot be reasonably understood except as being true or substantially true." *Id.* And "a statement is substantially true if the statement

would not have a different effect on the mind of the [recipient] from that which the pleaded truth would have produced." *Id.* at 246 (quoting *Franklin v. Daily Holdings, Inc.*, 135 N.Y.S.3d 6, 6 (N.Y. App. Div. 2015)).

New York law recognizes—in addition to the defense of truth—certain qualified privileges that may immunize a declarant for liability from a defamatory statement. *Conti v. Doe*, No. 17 Civ. 9268 (VEC), 2021 WL 1578047, at *11 (S.D.N.Y. Apr. 22, 2021) (collecting cases). The common-interest privilege "extends to a communication made by one person to another upon a subject in which both have an interest." *Liberman*, 605 N.E.2d at 349. The privilege "most commonly arises in the context of workplace communications." *Conti*, 2021 WL 1578047, at *12 n.18. "Communications by supervisors or co-workers made in connection with the evaluation of an employee's performance, including allegations of employee misconduct and communications regarding the reasons for an employee's discharge, fall within the privilege." *Id.* (quoting *Albert v. Loksen*, 239 F.3d 256, 272 (2d Cir. 2001) (further citations omitted)). "The qualified common interest privilege is also sometimes applied when allegedly defamatory statements are published only among members of an organization." *Id.* "To invoke the privilege, the parties need only have such a relation to each other as would support a reasonable ground for supposing an innocent motive for imparting the information." *Scott v. Thayer*, 75 N.Y.S.3d 603, 605 (N.Y. App. Div. 2018).

Statements of opinion, however, are not actionable as defamation under New York law, "however unreasonable the opinion or vituperous the expression of it may be." *Davis*, 754 F.2d at 85 (quoting *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir. 1977)). Whether a challenged statement is an opinion is a question of law. *See id.* A statement of "pure opinion" is "'either accompanied by a recitation of the facts upon which it is based' or 'does not imply that it

is based upon undisclosed facts.'" *Biro*, 883 F. Supp. 2d at 461 (quoting *Steinhilber v. Alphonse*, 501 N.E.2d 550, 552 (N.Y. 1986) (citations and quotations omitted)).

     The New York Court of Appeals has identified several factors to assist courts in distinguishing opinion statements from potentially actionable statements of fact:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Gross v. N.Y. Times Co.*, 623 N.E.2d 1163, 1167 (N.Y. 1993) (alteration omitted) (citations and quotation marks omitted). "Unlike the Federal Constitution, the New York Constitution provides for absolute protection of opinions." *Celle*, 209 F.3d at 178.

     Finally, under New York law, to recover on a defamation claim, a plaintiff must either plead special damages or that the statements are defamatory *per se*. *Id.* at 179. Defamatory *per se* statements "are actionable without pleading and proof of special damages." *Id.* (citations and quotation marks omitted)). Two such categories of defamatory *per se* statements are those that "charge the plaintiff with a serious crime" and those that "tend to injure another in his or her trade, business or profession." *Liberman v. Gelstein*, 605 N.E.2d 344, 347 (N.Y. 1992). However, as to statements regarding criminal conduct, "the law distinguishes between serious and relatively minor offenses." *Id.* "[O]nly statements regarding the former are actionable without proof of damage." *Id.* If a statement is defamatory *per se*, "injury is assumed," even where the plaintiff does not plead special or even actual damages. *Celle*, 209 F.3d at 179. Whether a challenged statement constitutes defamation *per se* is a question of law. *Geraci v. Probst*, 938 N.E.2d 917, 922 (N.Y. 2010).

b.     *Application to Lopez's Statements*

Lopez and SP Plus make three arguments for dismissal of the defamation claims based on

Lopez's statements: first, that the first set of statements—that Moleon urinated in public—was

substantially true, SP Plus MTD at 17–18; second, that the SAC does not plead with specificity

to whom the statements were published, *id.* at 19; and third, that the common interest privilege

covers the first two sets of statements—about Moleon's public urination and unprofessional

conduct. *Id.* at 19–20. At a minimum, the latter two arguments—based on the failure to plead

publication and the existence of a common interest privilege—require dismissal.

i.     *Publication*

Lopez made the allegedly defamatory statements (1) "in communications to all parties

relating to Plaintiff Moleon's discharge," SAC ¶ 14; (2) to unspecified third parties present on

the phone call in which Lopez terminated Moleon, *id.* ¶¶ 60, 113, (3) in front of unspecified SP

Plus employees at her office during that call, *id.* ¶¶ 56, 113; (4) at Moleon's discharge grievance

meeting, *id.* ¶ 74; and (5) in Moleon's discharge documents, *id.* ¶¶ 14, 177. Tellingly, none of

these allegations specifies who heard the statements. The first allegation, that "all parties" heard

the statements does not state when, how, and under which circumstances the statements were

heard. The second, third, and fourth do not identify any recipient. And Moleon's discharge

documents are, as pled, "in the sole possession of SP [Plus]." *Id.* ¶ 21. The SAC thus does not

plead, with specificity, the time, manner, or recipient of any allegedly defamatory statements.

*See, e.g., Ello*, 531 F. Supp. 2d at 581 (denying as futile amending the complaint to add

defamation claim where "[p]laintiff fails to identify to whom [the] statements were made, or the

time and manner in which they were made"); *Reeves v. Cont'l Equities Corp.*, 767 F. Supp. 469,

473 (S.D.N.Y. 1991) (dismissing defamation claim where plaintiff failed to specify when, by

whom, and to whom the statements were made); *Mobile Data Shred, Inc. v. United Bank of Switzerland*, No. 99 Civ. 10315 (SAS), 2000 WL 351516, at *7 (S.D.N.Y. Apr. 5, 2000) (dismissing slander claim because plaintiff "fail[ed] to indicate to whom the allegedly defamatory statements were published"); *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 416 (S.D.N.Y. 2009) (dismissing defamation claim based on memorandum where plaintiff failed to identify to whom, when, and where the memorandum was distributed).

ii.   *Common Interest Privilege*

The SAC pleads that the allegedly defamatory statements were made (1) during Moleon's grievance proceedings and/or (2) to SP Plus employees.

The former statements fall under the common interest privilege, because, among the participants at the proceedings, there is "a relation to each other as would support a reasonable ground for supposing an innocent motive for imparting the information." *Scott*, 75 N.Y.S.3d at 605. Here, all participants in the grievance hearing shared a common interest in truth-finding and open communication to determine whether there were valid grounds for Moleon's discharge. It would "inhibit the offer of honest statements" if, each time an employer ventilated reasons for an employee's discharge that cast the employee in a negative light, that employer exposed him- or herself to the prospect of a defamation suit. *See Lettis v. U.S. Postal Serv.*, 39 F. Supp. 2d 181, 206 (E.D.N.Y. 1998).

Lopez's latter statements—to SP Plus employees—also fall within the privilege. As pled, these were "[c]ommunications by supervisors or co-workers made in connection with the evaluation of an employee's performance, including allegations of employee misconduct and communications regarding the reasons for an employee's discharge." *Loksen*, 239 F.3d at 272.

c.   *Application to Doe's Statements*

34

Doe pursues dismissal of the SAC's defamation claim against him, on the grounds that it (1) is preempted by Labor Management Relations Act § 301, (2) is partially preempted by the National Labor Relations Act, and (3) was substantially true. Union MTD at 24–27. The last argument is sufficient to carry the day for Doe.

Moleon alleges that Doe falsely stated or implied that he urinated intentionally and in a public place. Doe's statement must be evaluated on its own terms, as pled, not as characterized. As alleged, Doe's statement at the union's office was simply that Moleon had "urinated in public" and that such was "grounds for termination." SAC ¶¶ 22, 58, 72, 86, 92, 151, 176. There is no allegation that Doe made that statement with any particular intent other than to recount a factual event. *Levin*, 119 F.3d at 195. And Moleon does not dispute that—despite his good-faith attempt to gain access to the restroom—he indeed ultimately urinated outside the restroom and in a place to which others had access. As such, Doe's statement is substantially true. *See Tannerite Sports*, 864 F.3d at 246–47. Moleon counters that, as alleged, there was an "employees only" sign nearby that meant that only workers were permitted to be present. But the statement that Moleon had "urinated in public," fairly read, does not connote that all, as opposed to some, some members of the public (of which employees such as of Kent Security and SP Plus) had lawful access. Nor does the statement comment on Moleon's statement of mind or his degree of intentionality in taking that act. Moleon's characterization of Doe's terse statement as suggesting venality thus overreaches. It impermissibly strains to interpret Doe's statements in a defamatory sense. *Celle*, 209 F.3d at 178.[6]

---

[6] As for the part of Doe's statement that Moleon's act was grounds for termination, although Moleon has grieved that decision, he does not appear to claim that that statement defamed him. In any event, that statement appears to be a pure statement of opinion—not one that conveys that the speaker had access to undisclosed facts—and as such is non-actionable. *Biro*, 883 F. Supp. 2d at 461.

### 3.   *Prima Facie* Tort

#### a.   *Applicable Legal Standards*

"Four elements must be alleged and proved to support a claim of prima facie tort: (1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, and (4) by an act or series of acts that would otherwise be lawful." *Hall v. City of White Plains*, 185 F. Supp. 2d 293, 304 (S.D.N.Y. 2002) (citing *Curiano v. Suozzi*, 469 N.E.2d 1324 (N.Y. 1984)). "The first element requires "disinterested malevolence," which means that "the plaintiff cannot recover unless the defendant's conduct was not only harmful, but done with the sole intent to harm." *Id.* at 304–05 (quoting *Twin Lab'ys., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 571 (2d Cir. 1990)). Motives "such as profit, self-interest, or business advantage" defeat a *prima facie* tort claim. *Twin Lab'ys.*, 900 F.2d at 571.

*Prima facie* tort is a "cause of action that is highly disfavored in New York." *Nevin v. Citibank, N.A.*, 107 F. Supp. 2d 333, 347 (S.D.N.Y. 2000). Indeed, "it is well settled that any claim that is covered by a traditional tort cannot be the basis for a claim of *prima facie* tort— even if the traditional tort claims turn out not to be viable." *Id.* (citing *Gertler v. Goodgold*, 487 N.Y.S.2d 565, 572 (N.Y. App. Div. 1985), *aff'd*, 489 N.E.2d 748 (N.Y. 1985)).

#### b.   *Application to the Employer Defendants and Doe*

The SAC's *prima facie* tort claim, brought against the Employer Defendants and Doe, fails for two reasons. First, it is not based on facts beyond those alleged to support its deficient claims of IIED and defamation. Allowing a claim of *prima facie* tort to proceed would thereby impermissibly revive Moleon's failed traditional tort claims in the guise of a *prima facie* tort.

Second, the SAC does not allege facts that plausibly plead "disinterested malevolence" by these defendants. The SAC repeatedly faults Lopez's and SP Plus's descriptions of his

36

conduct as volitional and as "vandalism," and faults the termination decision as "malicious." SAC ¶¶ 18, 21, 70, 91, 158.  But it does not plead facts plausibly alleging that harming him was their sole intent.  The SAC instead alleges that the Employer Defendants were motivated by a desire to economize by seizing of the opportunity the incident presented to discharge an older employee who cost SP Plus more than others in benefits and ERISA plan contributions.  *Id.* ¶ 118.  As to Doe, the SAC only pleads that, after making his statements he "shrugged his shoulders and walked away." *Id.* ¶¶ 72, 83, 92, 176.  This, too, falls far short of establishing that Doe acted with an intent to harm, let alone with the "sole intent to harm." *Hall*, 185 F. Supp. 2d at 304–05.  The SAC does not plausibly plead the requisite intent as to any defendant.

### 4.      Civil Conspiracy

"Under New York law, '[t]here is no substantive tort of conspiracy.'" *Kesner v. Dow Jones & Co.*, 515 F. Supp. 3d 149, 191 (S.D.N.Y. 2021) (quoting *Goldstein v. Siegel*, 244 N.Y.S.2d 378, 382 (N.Y. App. Div. 1963)).  "Rather, 'allegations of civil conspiracy are permitted to connect the actions of separate defendants with an otherwise actionable tort.'" *Id.* (quoting *Cohen Bros. Realty Corp. v. Mapes*, 119 N.Y.S.3d 478, 483 (N.Y. App. Div. 2020)); *see also ACR Sys., Inc. v. Woori Bank*, 232 F. Supp. 3d 471, 478 (S.D.N.Y. 2017).  In addition to pleading the primary tort, a complaint alleging civil conspiracy must also plead (1) "an agreement between two or more parties"; (2) "an overt act in furtherance of the agreement"; (3) "the parties' intentional participation in the furtherance of a plan or purpose"; and (4) "resulting damage or injury." *Id.*

Here, the only freestanding substantive torts that the SAC alleges are defamation, IIED, and *prima facie* tort.  Because those claims all are deficiently pled, the SAC's claim of civil conspiracy must also be dismissed as to the moving defendants.

## CONCLUSION

For the foregoing reasons, the Court grants in full the motions to dismiss by the Union Defendants and the Employer Defendants.  The claims that survive because they were not subject to the motions to dismiss are (1) against the Union, the duty of fair representation claim, and (2) all claims against the Kent Defendants.  The Clerk of Court is respectfully directed to terminate the motions pending at dockets 57 and 61, and to terminate SP Plus, Lopez, and Doe as parties.

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: December 3, 2021
      New York, New York